# EXHIBIT A

## MASTER LOAN AGREEMENT

This Master Loan Agreement supersedes all pervious term sheets and discussions and is the final documentation of the Parties' undertakings which is entered into and effective on the date of mutual execution hereof by and between:

**TOURNAN TRADING PTE LTD** for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, #3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Borrower");

**AND**

**AMERICA 2030 CAPITAL LIMITED**, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Lender").

Borrower and Lender are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

### SECTION 1
### DEFINITIONS

1.1    <u>Defined Terms</u>. As used in this Agreement and any other agreement(s) entered into by the Parties, the following terms shall have the following meanings:

"Agreement" shall mean this Master Loan Agreement, including any Exhibits or Schedules hereto, and as amended or supplemented from time to time, or as incorporated by reference into subsequent agreements.

"Approved Loan Amount" is the amount that Lender, subject to market conditions and Lender's discretion, is willing to fund the Loan up to.

"**Business Day**" shall mean the working day of a calendar week, except Saturday, Sunday and public holidays in accordance with relevant applicable laws – Hong Kong & Singapore

"**Breach**" shall mean any of the Events of Default specified in this Agreement and other Loan Documents that constitute a default unless specified otherwise.

"**Closing Date**" shall mean the day in which the Pledged Collateral has been delivered to and confirmed by the Depository Broker.

"**Closing Statement**" shall mean a statement in the form attached to this Agreement as <u>Exhibit 1</u>, which Closing Statement shall be delivered by Lender to Borrower following the delivery of the Pledged Collateral to the Depository Broker.

"**Currency**" the Loan and all interest and fees shall be in United States of American Dollars ("USD"). If the Pledged Collateral is a security which is priced and traded in a market and currency other than USD, the Parties agree to convert to USD for all purposes.

"**Default**" shall mean any of the Events of Default specified in this Agreement and other Loan Documents.

"**Depository Account**" or "Account" shall mean the account(s) established pursuant to this Agreement and other Loan Documents for the receipt and possession of the Pledged Collateral.

"**Depository Broker**" shall mean the financial institution selected by Lender for the receipt of the Pledged Collateral and any top-up.

"**Event of Default**" shall mean any of the events specified in Section 7.1 hereof.

"**Fair Market Price**" ("FMP") shall mean with respect to the stock or securities provided as Pledged Collateral the average of the last sale price on three (3) consecutive Business Days prior to closing. That average price shall be the per-share price of the Pledged Collateral used to establish its fair market value ("FMV").

"**FMV**" shall mean the amount, expressed in US dollars, equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares comprising the Pledged Collateral.

"**Issuer**" shall mean the corporate entity that has distributed shares of SUNPOWER GROUP LTD (SPWG:SP).

"**Lender's Remedy**" shall mean termination of the Loan and forfeiture of the Pledged Collateral in accordance with Section 7.2 *infra*.

"**Lien**" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest, or encumbrance of any kind in respect of such asset.

"**Loan**" shall mean the total contractual gross amount lent to Borrower by Lender on a nonrecourse basis for the specified term and subject to the stated conditions.

"**Loan Documents**" shall mean collectively, this Agreement, the Power of Attorney, the Closing Statement, and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner so as to give meaning and effect to all their provisions.

"**Material Event**" is such that is individually exemplified in Section 5.2.

"**Maturity Date**" shall have the meaning provided in Section 2.6(a).

"**Party**" shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

"**Proof of Funds**" shall mean cash or liquid securities.

"**Term of the Loan**" shall mean when the Loan starts as defined by Verification Day and ends as defined by Maturity Date.

"**Pledged Collateral**" shall mean the actual shares delivered to Lender as a consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change of the Pledged Collateral.

"**Valuation Event**" shall mean that the FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange.

"**Verification Day**" shall mean the Business Day after the Pledged Collateral has been received and posted to Lender's account prior to Closing Date.

1.2   **Use of Defined Terms.** All terms defined in this Agreement shall have such defined meanings when used herein and in any other Loan Documents made or delivered in conjunction with this Loan transaction.

1.3   **Lender's Discretion.** Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date.

1.4   **Statements as to Knowledge.** Any statements, representations, or warranties which are based upon the knowledge of Borrower shall be deemed to have been made after due inquiry with respect to the matter in question but without Borrower being required to seek an opinion of counsel with respect thereto.

## SECTION 2
## MATERIAL TERMS OF THE LOAN

2.1   **Approved Loan Amount.**

(a)   Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to Twenty Five Million ($25,000,000.00) USD of the current FMV of the Pledged Collateral. The Approved Loan Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

Broker and shall be memorialized in a Closing Statement as example in the form of Exhibit 1 hereto, which is hereby incorporated by reference.

(b)    Where the Loan is repaid in full at maturity, Borrower shall be entitled to all of the appreciation in the FMV of the Collateral, if any.

(c)    For purposes of Section 2.1(c), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) fifty-five percent (55%) of the Pledged Collateral by (ii) the FMV.

(d)    Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding.

2.2    Interest Rate.

(a)    All outstanding amounts of the Loan shall bear an interest rate in an amount equal to three and four point nine tenths percent (3.49%) per year to be paid to Lender in quarterly installments and on the Maturity Date. Interest payment shall be collected in advance of the Loan and shall accrue daily both before and after any Event of Default, demand, court judgment, or arbitral award, and shall be calculated on the basis of the actual number of days elapsed and on the basis of a year of three hundred and sixty five (365) days (three hundred and sixty six (366) days in a leap year).

(b)    The first interest payment date for the Loan shall be due on the first Business Day of the third month following the applicable Closing Date and such payment shall be based on a quarter year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due. All subsequent payments (except otherwise noted herein) shall be due on the first Working Day of each third month thereafter for the Term defined in Section 2.5 (as such Term may be extended) until the Maturity Date.

(c)    Subject to Section 2.1, all interests due hereunder shall be paid in or its value determined in U.S. dollars and made by way of certified check, wire transfer or other immediately available funds as directed by Lender.

2.3    Prepayment. There shall be no prepayment ("Prepayment") of the Approved Loan Amount or of any interest due under the Loan permitted during the first twelve (12) months of the Term, except any

payments to be received pursuant to a Change in Collateral event. Borrower may prepay the Approved Loan Amount after the lock-up period of 1 year, but shall be subject to a two percent (2%) prepayment fee.

2.4    **Fees**.

(a)    **Loan Origination Fee**. Contemporaneous with the funding of the Loan by Lender, Borrower shall pay to Lender an agreed upon Loan origination fee ("**Lender's Origination Fee**") of three tenths percent (3%) of the Approved Loan Amount actually funded. Lender is authorized to automatically deduct such Origination Fee.

(b)    **Loan Maintenance Fee**. Borrower shall pay to Lender an annual maintenance fee ("**Lender's Maintenance Fee**") of five tenths percent (0.5%) of the Approved Loan Amount. Lender is authorized to deduct in advance the Maintenance Fee from the Approved Loan Amount for the first year and the same shall be paid by Borrower on each anniversary of the Loan thereafter for all the years constituting the Term of the Loan.

(c)    **Third Party Expenses.** Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement. For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees.  Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year fee is deducted from the Loan proceeds.

(d)    **Break-Up Fee**. In the event that Borrower fails to deliver the Pledged Collateral after execution of this Agreement, then there shall be a Break-Up Fee equal to five percent (5%) of the FMV of the Approved Loan Amount. The Break-Up Fee, also known as Liquidated Damages Fee or Rescission Fee, is effective upon the due execution of this Agreement by both Parties, and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to the Depository Broker. This five percent (5%) Break-Up Fee applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which are covered under Section 7 of this Agreement.

(e)    **Other Fees**. Borrower shall pay for third party legal expenses and opinions to validate the stock legitimacy and transferability as well as costs associated with the transfer, if any.

2.5    **Extra Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, Borrower has the right to request that Lender increase the Approved Loan Amount at the same Loan to Value (LTV) as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Approved Loan Amount, up to the full FMV of the Pledged Collateral at the time of the written request. Borrower may exercise this provision no more than once every six (6) months.

2.6    **Term of the Loan and Maturity Date of Loan**.

(a)    The Loan shall mature, and the Approved Loan Amount together with all accrued interest thereon shall be due and payable, three (3) years subsequent to the occurrence of the Closing Date (the "**Maturity Date**" or "**Maturity**").

(b)    The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Approved Loan Amount (the "**Extension Fee**") shall be due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date at the prevailing annual interest rate at the time of extension.

(c)    No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Approved Loan Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Approved Loan Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "**Proof of Funds**"). The provision of proof of funds can be a screenshot of Borrower's bank or securities account holdings, or a copy of bank or securities account statement sent to the Lender via email.

2.7    **Closing**. The Closing Date shall be no later than three (3) Business Days after the Verification Day, assuming the conditions to Lender's obligations set forth in Section 6 herein are satisfied. The balance payment ("**Balance Payment**") shall be paid within three (3) Business Days of the written receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

Broker. The Balance Payment shall mean the Approved Loan Amount less any Origination Fee, costs, or expenses, if applicable and as set forth in the Closing Statement, not satisfied in cash by Borrower. The Balance Payment shall be settled (paid) to the account(s) designated by the Borrower per the following instructions:

| | |
|---|---|
| Bank/Institution Name | UBS AG, Singapore |
| Swift Code No/Routing Number | UBSWSGSG |
| Account Number | 0546-0086 5330 |
| Account Name | MA MING |
| Address of Account | one Raffles Quay #50-01 North Tower Singapore 048583 |

**2.8** **Payment of the Approved Loan Amount and Interest on Maturity Date.** Repayment of the Approved Loan Amount plus any other obligations due to Lender, including but not limited to interest due on the Approved Loan Amount, shall be made on the Maturity Date. If the overdue Approved Loan Amount and other obligations are not received by Lender within three (3) Business Days of the original due date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement.

**2.9** **Loan Termination and Redelivery of the Pledged Collateral.** This Agreement shall terminate when all of Borrower's obligations have been paid in full. Lender confirms and will maintain its full ability to return the Pledged Collateral, and all rights, benefits and interests in relation thereto ("Sunpower shares") at the FMP, to Borrower, free of any encumbrance within five (5) Business Days of Borrower's satisfaction of its obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. For the purpose of this Agreement, a return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, reclassification, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral. Lender confirms to return only Sunpower shares, and not shares of other companies nor cash nor other equivalents.

### SECTION 3

### NATURE OF LOAN AND THE PLEDGED COLLATERAL

3.1    **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of the obligations and will not make any claim or institute any action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral.

3.2    **Lender's Appointment of Depository Broker.** Lender shall have the exclusive right to appoint a "Depository Broker" (a securities broker/dealer licensed in the local jurisdiction that receives and manages the Pledged Collateral) for the purpose of receiving and possessing the Pledged Collateral.

### SECTION 4

### REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants to Lender that:

4.1    **Capacity.** Borrower has sole legal and equitable title to the Pledged Collateral or as corporate officer or director, Borrower has good and lawful authority to deliver all of the Pledged Collateral in the manner hereby contemplated to the possession of Lender.

4.2    **No Liens or Restrictions.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities. Borrower covenants that so long as the Loan or any obligations to Lender remain outstanding and unpaid, Borrower shall not create, assume, or suffer to exist any Lien of any kind upon any of the Pledged Collateral. Borrower further represents and warrants that the securities being pledged to Lender pursuant to this Agreement are unrestricted and free-trading and that they are outside of any holding period that might prohibit their disposition.

4.3    **Non-Reliance.** Borrower is not relying on Lender for purposes of trading in securities or retaining Lender to facilitate stock trades for the Borrower or on behalf of the Borrower. Borrower further represents and warrants that it has not relied, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication. Borrower understands and concedes that Lender is not a broker-dealer under U.S. securities laws or any acts or regulations related thereto and that Lender is not engaging in the business of buying and selling securities for its own accounts or the accounts of others or facilitating trades or effecting transactions in the securities for the account of others.

Borrower further represents and warrants that it understands and agrees that only a registered broker-dealer can facilitate stock trades in accordance with Hong Kong Securities laws. It is the intent of the Parties that the Lender will only control and encumber the Pledged Collateral in accordance with this Agreement as inducement for the Lender to extend financing.

Borrower finally represents, warrants, and covenants that it has not entered into the subject Agreement to trade in stock or to circumvent the requirement that stock trades are only to be facilitated by a registered broker-dealer in accordance with applicable Hong Kong laws.

4.4    **Cooperation.** Borrower will cooperate in executing any document provided by Lender's Depository Broker and clearinghouse as required by applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction. This duty attaches upon the due execution of this Agreement and endures until its termination, whether by reason of Default or the fulfillment of all obligations thereunder. Willful failure to execute a document required or reasonably necessary in the course of this Agreement shall constitute an Event of Default.

4.5    **Professional/Accredited Investor.** Borrower is an accredited investor under Hong Kong law and understands and acknowledges that owning securities or borrowing against them creates uncertain and unpredictable risk which outcome may substantially reduce or collapse their value. Borrower understands that as a result of the risk associated with margining securities, borrower may lose all of the securities and their entire value. Borrower is versed in the knowledge of securities borrowing and the inherent risks such speculative activity may bring.

4.6    **Waiver.** Borrower will not seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate

and an incurable default. Borrower will not interfere in any way or challenge the validly or enforceability of this Agreement and the same shall be a Breach thereof.

## SECTION 5

## REPRESENTATIONS AND WARRANTIES OF LENDER

Lender represents and warrants to Borrower that:

5.1     Short Selling, Trading, and Re-Pledging. Lender is not engaged and will not engage, directly or indirectly, in short selling any security by borrowing the shares from any entity or person and later buying shares in the same security, then returning the borrowed shares in an effort to make a profit. Nor will Lender re-pledge or hypothecate the shares to anyone. Lender will not sell or trade in the shares for any reason whatsoever unless disposition of the shares is warranted, assuming a default, Lender is not limited to provisions of Section 7.1 of this Agreement.

5.2     Material Event. The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's Account(s) to Lender's accounts(s) or any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives (Guo Hongxin and Ma Ming) of the Issuer; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses of the Issuer; loss of material patent that accounts for more than fifty percent (50%) of the Issuer's sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophically the events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade of the Issuer; major employees layoff of the Issuer affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on Issuer's earnings; media notification of money laundering or other illegal activities by key executives (Guo Hongxin and Ma Ming) of the Issuer; or invasion by police or other regulatory authorities confiscating the Issuer's records. For clarity purposes, Material Event mentioned herein does not include the events of default listed in section 7.1.

5.3    **Dividends, Interest, and Other Distributions.** Upon maturity, Lender shall credit Borrower for all dividends, if any. No dividends will be credited to Borrower if they are not paid by issuer to the Depository Broker.

5.4    **Voting Rights and Powers.** Borrower is entitled to exercise all voting or other such consensual rights and powers until the security interest is enforced. Lender will not exercise any voting or other such consensual rights or powers under the terms of this Master Loan Agreement.

5.5    **Best Efforts Approach.** Despite stock market volatility and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety.

## SECTION 6
## CONDITIONS TO LENDER'S OBLIGATIONS

6.1    **Conditions Precedent.** The obligation of Lender to make the Loan is subject to the fulfillment of the following conditions precedent (to the satisfaction of Lender):

(a)    The delivery of duly executed Master Loan Agreement and Power of Attorney;

(b)    The delivery of the stock in electronic form representing the Pledged Collateral; and

(c)    That all matters, documentations, and other instruments in connection with the Loan are satisfactory in form and substance to Lender and its counsel.

6.2    **Market Conditions.** Should the Pledged Collateral experience a material Valuation Event or material change in average daily trading volume prior to funding, Lender shall have the right to cease the funding of the Loan until such circumstances are dissipated or cured. The Pledged Collateral to remain with Lender, unless the Borrower repays all outstanding loans and interest, if any; or the Borrower terminates this Agreement and no amounts of loans and interest are outstanding upon which in each case, the Lender must release and return the pledged collateral to the Borrower.

## SECTION 7

### EVENTS OF DEFAULT AND REMEDIES

7.1    **Events of Default.** An "Event of Default" shall exist if any one or more of the following occurs:

(a)    Failure by Borrower to pay the interest and applicable fees when due or the Approved Loan Amount when due or any other default in the performance of an obligation that is not cured within the applicable cure time; applicable cure time being 3 business days as mentioned under Section 2.8.

(b)    If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading;

(c)    If the class of securities provided as Pledged Collateral is delisted or trading is halted for more than three (3) consecutive Business Days by a regulatory agency or otherwise (both constituting an immediate and incurable Event of Default);

(d)    If Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties;

(e)    A decrease in the daily trading volume of Issuer securities of more than fifty percent (50%) cumulatively for three (3) consecutive trading days below the average daily trading volume for Issuer securities for the three (3) month period preceding the Closing Date, and remains below for one (1) trading day after the trading day first falls below, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) of the original number of shares pledged for this Agreement herein and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(f)      If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null or void or the validity or enforceability thereof shall be contested by Borrower or by any other Person;

(g)      If a Valuation Event occurs and Borrower fails to cure such Valuation Event as provided herein. A Valuation Event shall mean that the current FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount, as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange (the "Default Floor"). If a Valuation Event occurs, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) more than the FMV and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(h)      If Lender does not receive Borrower's written Proof of Funds under Section 2.6(e) no later than thirty (30) calendar days prior to the Maturity Date of the Loan; or

(i)      If the Issuer of the Pledged Collateral is notified by the appropriate regulatory agency that it is out of compliance or subject to sanction or restriction; or

(j)      If the Issuer of the Pledged Collateral experiences a material adverse event that would impact either its earnings, credit report rating, or underwriting recommendation.

7.2      **Lender's Remedy**. Lender shall not and will not have any recourse or remedy or any course of action against Borrower for Breach of this Agreement, other than occurrence of any of the foregoing Event(s) of Default, if not cured within the designated cure period, if applicable, shall terminate the Master Loan Agreement, result in acceleration of all Loan amounts, interest, expenses, and fees due thereunder, and cause the forfeiture of the Pledged Collateral. The Lender shall notify the Borrower in writing of the acceleration and the outstanding amounts owing to the Lender, whereupon the Borrower shall repay all such outstandings within three (3) business days (not subject to the lock-up period mentioned in Section 2.3) of the notice. Upon payment by the Borrower, Lender will return the Pledged Collateral to Borrower within five (5) business days of Borrower's repayment, and not forfeit the Pledged

Collateral. For the avoidance of doubt, the Lender is entitled to enforce the Pledged Collateral after the delivery of the acceleration notice, but only to the extent of the amount owing by the Borrower to the Lender, if the Borrower does not pay within three (3) business days of receiving the acceleration notice.

## SECTION 8

### Arbitration in the Event of Dispute

8.1     **Arbitration of Claims, Disputes, or Controversies**. The Parties shall endeavor to settle any dispute, controversy, or claim arising out of or relating to this Agreement including the existence, validity, interpretation, performance, breach, termination thereof, or any dispute regarding non-contractual obligations arising out of or relating to it ("**Dispute**") first by direct negotiation between managing directors or similar senior executives within forty five (45) days after written notice has been sent by one Party to the other Party (the "**Consultation Period**"). However, if direct negotiation does not result in a resolution of the Dispute within the Consultation Period, then the Parties agree to submit to mandatory and exclusive arbitration administered by the Hong Kong International Arbitration Centre under the Hong Kong International Arbitration Centre Administered Arbitration rules in force when the Notice of Arbitration is submitted by three (3) arbitrators. In such a case, each Party to the arbitration shall, in accordance with the said rules, appoint one (1) arbitrator and the arbitrators so appointed by the Parties shall in turn mutually select one (1) additional arbitrator. The place of arbitration shall be Hong Kong and the proceedings shall be conducted in the English language. The award shall be final and legally binding on the Parties and shall be subject to enforcement in any courts having jurisdiction over the Parties.

8.2     **Governing Law**. This Agreement and all Loan Documents delivered hereunder and any and all claims, controversies, and causes of action arising out of or relating to them shall be governed by the laws of the Hong Kong Special Administrative Region of the People's Republic of China, including its statutes of limitations, without giving effect to any conflict-of-laws rules that would result in the application of the laws of a different jurisdiction.

## SECTION 9

### Indemnity and Limitation of Liability

9.1    Neither party shall be liable for any indirect, incidental, opportunity loss, or consequential damages, including loss of revenue or profits or losses arising from its normal course of business, even if a Party has been advised of the possibility of such damages.

9.2    Borrower shall not hold Lender responsible for any fluctuations in the value of the Pledged Collateral that Borrower may experience during the pendency of the Loan.

## SECTION 10
## MISCELLANEOUS

10.1    Notices. All notices and communications to either of the Parties by the other shall be in writing, sent by overnight mail by a reputable commercial carrier or electronically and shall be deemed duly given on the earlier of the date the same is sent, if via electronic communications, or received, when deposited in the mail, postage prepaid, as follows:

If to Lender: AMERICA 2030 CAPITAL LIMITED
Attention: Mark Bentley, Director of Operations
Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,
Sheung Wan, Hong Kong
bentley@America2030.com; +16232132500

If to Borrower: TOURNAN TRADING PTE LTD
Attention: below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Ma Ming | | frankma@vip.163.com | +8613805188068 |
| Xie Yu | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | xieyucssc@aliyun.com | +8613801598802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510998 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 068807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

10.2    **Severability**. If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision is modified to meet legal conformity or, if impracticable, is stricken out entirely as if it were never included and the remainder of the terms and conditions contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect.

10.3    **Survival**. Except as herein provided, all representations, warranties, and covenants made in this Agreement shall survive the execution, delivery, and termination of this Agreement.

10.4    **Waivers**. No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified upon application.

10.5    **Gender and Number**. Unless the context otherwise requires, when used herein, the singular includes the plural, and vice-versa, and the masculine includes the feminine and neuter, and vice-versa.

10.6    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.7    **Confidentiality**. This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("**Confidential Information**") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of the Loan Documents. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency, unless ordered to do so by court of law.

10.8   **Force Majeure.** Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, degradation in stock value, stock market crash, illiquidity of the stock and other adverse market conditions, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

The Party affected by the Force Majeure Event shall promptly notify the other Party of the estimated extent and duration of such inability to perform its obligations hereunder. This Agreement shall remain in force until such time that the affected Party can perform.

10.9   **Assignment.** This Agreement cannot be assigned nor transferred by a Party without the prior written consent of the other Party. Such consent shall not be unreasonably withheld.

10.10   **Entire Agreement.** This Agreement contains the entire agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof.

10.11   **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) shall not be effective unless in writing and signed by authorized signatories on behalf of both Parties.

10.12   **Disclaimer.** IT IS MUTUALLY UNDERSTOOD AND AGREED THAT LENDER HAS FINANCIAL INTEREST AND PRIVILEGE IN THE PLEDGED SHARES PURSUANT TO THE PARTIES' UNDERSTANDING AND CONTRACTUAL AGREEMENT. BORROWER HAS NOT AND WILL NOT RELY ON ANY MARKETING MATERIAL OR STATEMENTS OF MATERIAL FACT MADE BY SALES AGENTS OR LENDER PRIOR TO, DURING, OR FOLLOWING THE CLOSING OF THIS TRANSACTION. ALL SUCH STATEMENTS AND MARKETING MATERIAL ARE HEREBY PURGED FROM THIS LOAN AGREEMENT AS THOUGH NO MARKETING MATERIAL EVER EXISTED OR STATEMENTS OF MATERIAL FACT WERE EVER MADE. BORROWER ATTESTS THAT, AT ALL TIMES, IT WAS REPRESENTED BY LEGAL

COUNSEL AND/OR BORROWER HAS HAD AMPLE OPPORTUNITY TO CONSULT ONE. BORROWER'S DECISION IS AT WILL AND SOLELY BASED ON ITS INDEPENDENT JUDGMENT. BORROWER HAS NOT BEEN DECLARED BY ANY COURT OF LAW TO BE INCOMPETENT OR OF NOT SOUND MIND. BORROWER IS FREE OF ANY EXTERNAL INFLUENCE OF OTHERS OR INFLUENCE OF DRUGS OR ALCOHOL WHEN CONSIDERING OR ENTERING INTO THIS AGREEMENT. BORROWER'S MIND IS FREE OF INFLUENCES OF DURESS, BODILY THREATS, TORTURE, KIDNAPING, EXTORTION, OR COERCION. BORROWER HAS EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER, IF ANY. BORROWER UNDERSTANDS THAT MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING. LENDER AGREES TO FOLLOW THE TRUTH IN LENDING ACT AND DOES NOT DISCRIMINATE ON THE BASIS OF SEX, RACE, NATIONALITY, OR RELIGION. BORROWER ASSUMES THE BURDEN OF TOPPING UP WHEN REQUIRED TO DO SO. BORROWER IS AWARE THAT MARKET CONDITIONS MAY CAUSE THE VALUE OF SECURITIES TO DECLINE. BORROWER CONCEDES THAT LENDER IS NOT RESPONSIBLE FOR THE DEGRADATION OF THE STOCK VALUE, WHETHER OWING TO AN ACTION(S) OR INACTION(S) OF LENDER. A DECLINE IN VALUE MAY REQUIRE ADDITIONAL SECURITIES OR CASH TO INCREASE THE VALUE OF THE COLLATERAL. A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES. INJUNCTIVE RELIEF APPLICATION BY BORROWER AND ANY INTERFERENCE BY THE DEPOSITORY AGENCY ARE NOT ALLOWED. BORROWER HEREBY WAIVES AND FOREVER DISCHARGES LENDER AGAINST ANY AND ALL CLAIMS UNDER SECURITIES LAWS. TAX CONSEQUENCES ARE THE RESPONSIBILITY OF BORROWER. WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING. BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION, SINCE LENDER MAY TRANSACT AT ANY TIME IN SAID PLEDGED COLLATERAL AND MAY DO SO IN ORDER TO FUND THE LOAN. LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND SELL PRIOR TO FUNDING. LENDER HAS THE PRIVILEGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS. LENDER AND ITS LOAN OFFICERS HAVE NOT PROVIDED LEGAL OR TAX ADVICE OF ANY KIND TO BORROWER. BORROWER IS TO

CONSULT A TAX PROFESSIONAL FOR ANY TAX ADVICE. NEITHER BORROWER NOR LENDER HAVE RECEIVED A KICK-BACK OR BRIBE OF ANY KIND IN ORDER TO INDUCE LENDER TO PROVIDE A FINANCING FACILITY. LENDER IS NOT A BROKER-DEALER OR FINANCIAL ADVISOR. THIS DISCLOSURE PROVIDES FULL TRANSPARENCY OF RISKS INVOLVED. LENDER IS NOT COMPENSATED BY ANY THIRD PARTY. NEITHER BORROWER NOR LENDER WILL PARTICIPATE IN OR ENGAGE IN ANY MONEY LAUNDERING SCHEME. THERE ARE NO PENDING NOR HAVE THERE BEEN ANY LAWSUITS OF ANY TYPE AGAINST LENDER IN ANY JURISDICTION OR COUNTRY. LENDER HAS NEVER BEEN SANCTIONED NOR FINED BY ANY AUTHORITY OR JURISDICTION. LENDER DOES NOT PROVIDE INVESTMENT ADVICE AND ITS LOAN OFFICERS AND SALES STAFF ARE PROHIBITED FROM DOING SO. BORROWER MUST INSURE THAT THE PLEDGED COLLATERAL STAYS WITHIN LENDER'S VALUE REQUIREMENT IN ACCORDANCE WITH THE MASTER LOAN AGREEMENT. LENDER WILL NOT BE LIABLE FOR DEVALUATION OF SECURITIES DURING THE TERM OF THE LOAN. LENDER IS NOT AN INSIDER OF THE SECURITIES BEING PLEDGED BY BORROWER AND LENDER DOES NOT AND HAS NOT OFFERED TO BUY OR SELL ADVICE TO BORROWER. LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL. A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER. BORROWER WILL NOT USE LOAN PROCEEDS FOR ANY ILLEGAL ACTIVITY, INCLUDING WITHOUT LIMITATIONS, USE OF LOAN PROCEEDS IN DRUG TRADE OR SUPPORT OF TERRORIST GROUPS. BORROWER WILL NOT TRANSACT WITH ANY ENTITY ON ANY INTERNATIONAL SANCTIONED LIST. LENDER IS NOT AFFILIATED WITH ANY GOVERNMENT AGENCY. BORROWER AGREES THAT THE LOAN IS SUITABLE FOR BORROWER'S NEEDS. LENDER HAS THE RIGHT, BUT NOT THE OBLIGATION, TO REFINANCE OR INCREASE LOAN AMOUNT IF THE VALUE OF SECURITIES INCREASE DURING THE TERM OF THE LOAN. BORROWER HAS RISK-TOLERANCE AND HAS FINANCIAL ABILITY AND LIQUID ASSETS TO POST MARGIN IN THE EVENT OF DEFAULT. BORROWER REPRESENTS THAT IT IS NOT AFFILIATED WITH ANY U.S. STOCK EXCHANGE. BORROWER REPRESENTS THAT BORROWER HAS FULL OWNERSHIP OF THE SECURITIES AND LEGAL CUSTODY AND AS OF THE DATE OF THIS AGREEMENT, IS NOT A DEFENDANT IN ANY LAWSUIT WHERE THE OWNERSHIP AND CONTROL OF THE PLEDGED SHARES ARE CHALLENGED BECAUSE LENDER WILL NOT BE A PARTY TO ANY SUCH CHALLENGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year written below. It is specifically agreed and understood that this Agreement shall not be binding upon the Parties until the date it is actually signed by Lender and Borrower, and that shall be the effective date of this Agreement.

**BORROWER:**

TOURNAN TRADING PTE LTD

_____
Signature

Ma Ming, Director
_____
Name and Title

June 4, 2018
_____
Date

**LENDER:**

AMERICA 2030 CAPITAL LIMITED

_____
Signature

VOL SKLBROV, MANAGING PARTNER
_____
Name and Title

JUNE 12, 2018
_____
Date

**EXHIBIT 1**
**CLOSING STATEMENT**

_____, 2018

Re:    Master Loan Agreement (the "MLA") by and between TOURNAN TRADING PTE LTD ("Borrower") and AMERICA 2030 CAPITAL LIMITED ("Lender").

On _____,2018, you delivered and posted shares of SUNPOWER GROUP LTD (SPWG:SP) to Lender's Account pursuant to the MLA, calculated based upon a fifty-five percent (55%) LTV. The Loan proceeds, based on current stock price, are to be distributed to Borrower on the Closing Date under the MLA as follows:

| | | |
|---|---|---|
| **Approved Loan Amount:** | $_____ | USD |
| **Lender's Origination Fee:** | 3% | USD |
| **Lender's Maintenance Fee:** | 0.5% per annum | USD |
| **Third Party Expenses:** | $[●] | USD |
| **Lender's Legal Expenses:** | $15,000.00 | USD |
| **Lender's Processing Fee:** | $3,500.00 | USD |
| **Balance Payment to Borrower:** | $[●] | USD |

The Balance Payment will be settled (paid) to your account on the Closing Date per the instructions provided in Section 2.7 of the MLA. Specifically, to the following:

| | |
|---|---|
| **Bank/Institution Name** | UBS AG, Singapore |
| **Swift Code No.** | UBSWSGSG |
| **Account Number** | 0546 – 00865330 |
| **Account Name** | MA MING |
| **Address of Account** | one Raffles Quay #50-01 North Tower Singapore 048583 |

## WITNESS

The foregoing instrument was acknowledged before me this __4th__ day of __June__, 2018,
by __Su, Qiyi__ (name) Legal & Compliance Manager (occupation). He/she is personally known to me
or has produced _____ as identification.

SIGNATURE OF WITNESS

***Contacts:***

**USA**

America 2030 Capital, LLC
1301 Shiloh RD, NW
Suite 1231
Kennesaw, GA. 30144

**United Kingdom**

America 2030 Capital Limited
Kemp House
160 City Road
London, United Kingdom
EC1V 2NX

**Hong Kong**

America 2030 Capital Limited
Unit 1411, 14/Floor Cosco Tower,
183 Queen's Road Central, Sheung
Wan, Hong Kong

www.america2030.net    ©1986-2018 All rights reserved.

# AMERICA **2030** CAPITAL LIMITED

## Investment Banking/Stock Loans

### IRREVOCABLE POWER OF ATTORNEY

By

**TOURNAN TRADING PTE LTD, as Principal**

And

**AMERICA 2030 CAPITAL LIMITED, as Attorney In Fact**

DATED___ OF_____ 2018

## POWER OF ATTORNEY

THIS IRREVOCABLE POWER OF ATTORNEY is granted as of this____day of_____,2018 By TOURNAN TRADING PTE LTD, for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500 (hereinafter, the "**Principal**"), which represents and warrants that they have the capacity and standing to grant AMERICA 2030 CAPITAL LIMITED (hereinafter, the "**Attorney In Fact**") this Power of Attorney, as the holder of the securities trading account no. [_____] located at:

Name of Subject Account:

Name of Depository Broker:

Address of Depository Broker:

| **Authorized Director Acting on Behalf of Attorney In Fact** | Specimen Signature |
|---|---|
| **Name:** Val Sklarov or Mark Bentley  **Address:** Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong  **Phone:** +1 (623) 213-2500  **Email:** val@america2030.net   bentley@america2030.net | |

## 1.    SCOPE OF AUTHORITY

The Attorney In Fact's scope of authority includes, but is not limited to: its ability to have access to, receive, and enquire about the information pertaining to the depository account(s) ("**Depository Account(s)**" or "**Account(s)**"); place, revise, or cancel orders for sales and purchase of securities; deposit, withdraw, and transfer funds or securities to and from the Attorney In Fact's account(s) or any third party account(s) of the Attorney In Fact's choosing; request advancement of the proceeds of securities transactions; execute all contracts and other documents necessary for use of the services and/or products provided by the Depository Broker in relation to the Account(s); close the Account(s); and exercise all rights and privileges and

perform all duties and obligations which may now or in the future pertain to the Principal as holder of the Account.

**2. PRINCIPAL's REPRESENTATION**

The Principal acknowledges that the Attorney In Fact may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from the Principal's Account(s) to any third party's account(s) of the Attorney In Fact's choosing, withdraw, or redeem any funds or other property in the Principal's Depository Account(s). However, the Attorney In Fact will not at anytime, under any circumstance sell the Pledged Collateral, unless in the Attorney In Fact's sole discretion, a foreseeable adverse Material Event would require the Attorney In Fact to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff effecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

**3. WAIVER**

The Principal hereby unconditionally and irrevocably relinquishes, forfeits, and renounces any right it may now or in the future have over the Depository Account(s) to the Attorney In Fact. The Principal shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with the Attorney In Fact's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Irrevocable Power of Attorney.

**4. PRINCIPAL RATIFIES ATTORNEY'S IN FACT ACTS**

The Principal ratifies and confirms whatever the Attorney In Fact lawfully does or purports to do pursuant to the authority granted to it by this Irrevocable Power of Attorney.

**5.     DEPOSITORY BROKER INDEMNITY**

The Principal acknowledges that the Principal is responsible for, and bound by, the instructions that the Attorney In Fact gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker in relation to the actions of the Attorney In Fact and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Irrevocable Power of Attorney.

**6.     INDEPENDENT LEGAL SIGNIFICANCE**

This Irrevocable Power of Attorney is of independent legal significance and incorporates the rights, waivers, and obligations of the Master Loan Agreement ("MLA"). To the extent that the provisions of this Irrevocable Power of Attorney conflicts with the MLA, this Irrevocable Power of Attorney governs.

**7.     EFFECTIVENESS**

This Power of Attorney is hereby made Irrevocable by the Principal and shall remain in full effect until such time as the Attorney In Fact revokes it by providing a certified board resolution to the Depository Broker to effect the termination of the authority granted to the Attorney In Fact under this Irrevocable Power of Attorney.

**8.** THE PRINCIPAL REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. THE PRINCIPAL IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN GRANTING THIS IRREVOCABLE POWER OF ATTORNEY. THE PRINCIPAL HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. THE PRINCIPAL ORDERS AND MANDATES THE DEPOSITORY BROKER THAT IRRESPECTIVE OF HOW THIS IRREVOCABLE POWER OF ATTORNEY MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS

SHALL COME SOLELY FROM THE ATTORNEY IN FACT AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY THE ATTORNEY IN FACT. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY THE PRINCIPAL AGAINST ANY LIABILITIES OCCASIONED BY THIS IRREVOCABLE POWER OF ATTORNEY.

As of this date, the Attorney In Fact will become and is hereby designated as the sole and exclusive authority over the subject Depository Account(s). This Power of Attorney takes effect on the date first stated above.

For and on behalf of Principal

_____
Signature

Ma Ming
Full Name

June, 4 2018
Date

WITNESS:

The foregoing instrument was acknowledged before me this 4th day of June, 2018, by Su, Qiu, (name) Legal & Compliance Manager (occupation). He/she is personally known to me or has produced _____ as identification.

_____
Signature of Witness

| USA | America 2030 Capital, LLC<br>1301 Shiloh RD, NW<br>Suite 1231<br>Kennesaw, GA. 30144 |
| --- | --- |
| United Kingdom | America 2030 Capital Limited<br>Kemp House<br>160 City Road<br>London, United Kingdom<br>EC1V 2NX |
| Hong Kong | America 2030 Capital Limited<br>Unit 1411, 14 Floor Cosco Tower, 183<br>Queen's Road Central, Sheung Wan, Hong<br>Kong |

# AMERICA **2030** CAPITAL LIMITED

## Investment Banking/Stock Loans

### CUSTODIAN MANAGEMENT AGREEMENT

Between

**TOURNAN TRADING PTE LTD**, as Borrower;

**AMERICA 2030 CAPITAL LIMITED**, as Lender;

And

[●], as Depository Broker

DATED_____ of_____2018

## Custodian Management Agreement

This Custodian Management Agreement (this **"Agreement"** or the **"CMA"**) is entered into, effective on the date of execution hereof, by and between:

**TOURNAN TRADING PTE LTD**, for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as (**"Borrower"**);

**AMERICA 2030 CAPITAL LIMITED**, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as (**"Lender"**);

**And**

_____ for itself, affiliates, and subsidiaries, with a principal place of business located at_____, and represented by_____,which represents and warrants that they have the capacity and standing to enter into this Agreement (hereinafter **"Depository Broker"**).

Borrower, Lender, and Depository Broker are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

**1**     Scope of this Agreement.

**1.1**     Lender and Borrower have entered into a Master Loan Agreement  (the **"MLA"**), which is independent of this Agreement and the Depository Broker is not bound by it, may not interpret or attempt to adhere to it, shall not base Lender's entitlement order (**"Entitlement Order"**) on it, shall not refuse to follow Lender's Entitlement Order, or attempt to interfere with any such Entitlement Order.

**2**     Control By Lender.

**2.1**     The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's

Account(s) to any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Depository Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

**2.2**    The Depository Account(s) held by the Depository Broker in favor of Lender are as follows:

| List of the Dedicated Depository Account(s) (Maintained by the Borrower with the Depository Broker Specifying Account Name, Signatory, Address, and Account Number): | |
|---|---|
| | |
| | |
| | |
| | |

**2.3**    The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of proceeds and trades. Borrower represents and warrants to both Lender and the Depository Broker that it owns the Pledged Collateral free and clear of any lien, whether voluntary or involuntary.

**2.4**    The Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement.

**2.5**    For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such nonrefundable fee shall be paid one year in advance. First year fee shall be deducted from the Loan proceeds.

**2.6**    Borrower hereby agrees to unconditionally and irrevocably relinquish, forfeit, and renounce any right it may now or in the future have over the Depository Account(s) to the Lender. Borrower shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with Lender's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Any attempt for Injunctive relief by Borrower or any interference by central depository agency shall be an immediate and an incurable default.

**3**    Borrower's Rights in the Dedicated Depository Account(s).

**3.1**    Until the Lender notifies the Depository Broker in writing that the Lender's security interest in the Depository Account(s) have terminated, the Depository Broker shall not distribute to the Borrower any securities, assets, funds, or property currently or in the future held in the Depository Account(s) whatsoever.

**4**    Depository Broker's Responsibility.

**4.1**    The Depository Broker shall immediately notify the Lender of the receipt of the Pledged Collateral into the Depository Account(s), including the amount of shares deposited, the stock price at the time of receipt, and confirmation that the Account(s) is now solely under the custody, care, and control of the Lender.

**4.2**    The Depository Broker will not be liable to the Borrower for complying with any Entitlement Orders originated by the Lender and the Borrower hereby waives any rights to claims against the Depository Broker in connection thereto. Further, it is agreed that the Depository Broker is

not obliged to verify and will not verify whether Lender has the right to give the Entitlement Order.

## 5    Indemnity.

5.1    Borrower acknowledges that Borrower is bound by the instructions that the Lender gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker, its officers, directors, employees, agents, and shareholders in relation to the actions of the Lender and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Agreement.

## 6    Termination.

6.1    Lender may at any time terminate this Agreement on not less than thirty (30) days written notice to the Depository Broker and the Borrower. The Depository Broker may terminate this Agreement on not less than thirty (30) days written notice to the Lender and the Borrower. Upon such termination by the Depository Broker, the Lender shall within two (2) Business Days issue an Entitlement Order to the Depository Broker ordering the Depository Broker to promptly transfer the Pledged Collateral to the Lender or to such person(s) under the written instructions issued by or on behalf of the Lender. Once a transfer is made pursuant to such Entitlement Order, the Depository Broker's obligations under this Agreement are or deemed to have been fully discharged.

## 7    Miscellaneous.

7.1    Borrower may not assign, transfer, charge, or novate any of its rights or obligations under this Agreement.

7.2    Capitalized terms used but not defined herein shall have the meanings given to such terms in the MLA.

7.3    All communications from and to any of the Parties hereto may be transmitted by mail to the addresses listed below or electronically and shall, in the case of the latter, have full legal force and effect, including electronic signatures contained therein.

**Lender:**

AMERICA 2030 CAPITAL LIMITED

Attention: Val Sklarov, Director and CEO

Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,

Sheung Wan, Hong Kong

val@America2030.net +1 623-213-2500

**Borrower:**

TOURNAN TRADING PTE LTD

Attention: below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Ma Ming | | frankma@vip.163.com | +8613805188068 |
| Xie Yu | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | xieyucssc@aliyun.com | +8613801598802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510998 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 068807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

**Depository Broker:**

_____

_____

7.4    BORROWER REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. BORROWER IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN ENTERING INTO THIS AGREEMENT. BORROWER HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. BORROWER ORDERS AND MANDATES THE DEPOSITORY BROKER THAT

IRRESPECTIVE OF HOW THIS AGREEMENT MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM LENDER AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY BORROWER AGAINST ANY LIABILITIES OCCASIONED BY THIS AGREEMENT.

## SIGNATORIES

Depository Broker: (Include Chop)

| _____ | _____ | _____ |
| Signature | Name and Title | Date |

**************************************************************************

Borrower: (Include Chop)

| _____ | Maning , Director | June 4 2018 |
| Signature | Name and Title | Date |

NOTARY PUBLIC

Notary Public is only certifying Borrower's signature

**************************************************************************

Lender: (Include Chop)

| _____ | VGL SKLGNOV | JUNE 10, 2018 |
| Signature | Name and Title MANBLING MEMBER | Date |

NOTARY PUBLIC

Notary Public is only certifying Lender's signature



*Contacts:*

USA

America 2030 Capital, LLC
1301 Shiloh RD. NW
Suite 1231
Kennesaw, GA, 30144

UNITED
KINGDOM

America 2030 Capital   Limited
Kemp House
160 City Road
London, United Kingdom
EC1V 2NX

HONG KONG

America 2030 Capital Limited
Unit 1411, 14/Floor Cosco Tower,
183 Queen's Road Central, Sheung
Wan, Hong Kong

www.america2030.net     ©1986-2018 All rights reserved.